Good morning, Your Honors. Matthew Sharp and William Cummings on behalf of Mr. Nogle. I'd like to reserve five minutes for rebuttal. I think our point is simple. Whether or not Mr. Nogle's filed his complaint timely under the statute of limitations is a question of fact. Our position is the facts interpreted in light most favorable for Mr. Nogle. Clearly, he did not discover, nor should he have reasonably discovered, the facts leading to his cause of action until after September 8, 2008. Counsel, what do we do with the fact that printed on the face of his health benefits card is the name Beech Street, that Beech Street signed the utilization approval for the endoscopy procedure, and that had he bothered to look at the summary plan description, he would have learned of the existence of Beech Street? Well, let me respond to each point. The letter, and I'd encourage the Court to look at the letter. It's at 35. All that letter says is that the procedure has been evaluated for medical necessity. Nobody ever has alleged that Mr. Nogle's procedure wasn't necessary. It was the manner in which the procedure was performed. So that doesn't say anything. Your argument has to turn on the fact that there was no way that a reasonably diligent inquiry would have disclosed the role of Beech Street in the, I'll call it, utilization reviews or quality assurance. I guess the decision as to who was admitted as a member of the preferred providers under this insurance plan. Well, if you look at what was available to Mr. Nogle, both the plan ID card, the plan, nothing within any of those documents says Beech Street is responsible for quality of care matters or credentialing with regard to the network for the benefit of people like Mr. Nogle. That was not available. Wasn't Beech Street printed on all of the explanation of benefits forms that he received for all the charges that were incurred? Well, the knowledge of Beech Street is not what triggers the statute of limitation. And, I mean, the example I would use is in the Sunrise case. When the statute began is when the plaintiff received the actual medical report which reflected the malpractice. That's when it triggered. In Oak Grove is another example. The plaintiff was aware that there was damage to the property but was not given facts to show the damage was due to the defect. Go ahead. What information led Nogle to believe FISERV or FirstServ was responsible for quality assurance in credentialing? Well, I think in the declaration of Ms. Morrison, she outlines the investigation that unfolded. And the primary issue I'd point to is the plan administrator under the documents themselves was FISERV. So that's what led to that conclusion. It wasn't until after FISERV was served that information was given to Mr. Nogle that Beech Street had assumed a direct obligation for quality of care. I mean, even the consultant for Beech Street. I'm sorry. The information that led to serving or suing FISERV was simply because its name was on the plan? No. It's more than that. It was they were the plan administrator. And that's in the plan documents. Not, and if you look at the ID card, it's the FISERV plan. I mean, Beech Street is not, I mean, it's on the card, but it's not indicative that they're in charge of the organization of the plan, if you will. The information Mr. Nogle had is FISERV was that entity. It wasn't until FISERV was sued that they provided Mr. Nogle information that says to the effect FISERV is not responsible for quality of care. And that's in the affidavit of Denise Best and the e-mail correspondence with Mr. Nogle's attorney. Go ahead. No, I'm sorry. Why did it take so long to serve first? Well, I mean, I'm not here to defend that issue. I think it's, I don't think it's relevant to the. It's relevant to diligency. I mean, the problem you've got is it looks like that he was represented by a lawyer who had some serious health problems and that there were lots of claims that were being made against these folks who ran the endoscopy center. And she just didn't get around or another lawyer didn't pick up the file and start making an investigation that pretty quickly would have led to learning that Beach Street was responsible for quality of care. Well, my response to that, Your Honor, would be the diligence inquiry is between March of 2008 to September 2008. Our position is if you conducted a reasonable inquiry, you wouldn't, I mean, you don't know the facts upon which the cause of action is based until after September. He knew in March of 2008 that he had contracted hep C, right? That's correct. Okay. So the district court said the clock started ticking in March of 2008 for that reason. And the district court's wrong because. Why is the district court wrong? Well. He knows he's been injured. He knows he just underwent or had undergone a colonoscopy or endoscopy at this clinic. But he's not on, he hasn't discovered the facts that would say Beach Street is responsible for that. So I would agree, I mean, he had multiple. He's got a claim against the endoscopy center in March of 2008, does he not? He has multiple causes of action. And I would agree that he's put on legal injury for his malpractice case in March of 2008. But that's not the standard in the State of Nevada is the cause of action. Well, of course, we haven't got to the point yet about talking about your novel theory here with regard to credentialing. And as I understand it, there's not a lot of Nevada case law that even recognizes that form of action, is there? Well, and again, I mean, that's not an issue on appeal. I mean, we have strong evidence that Beach. It's a tort-based claim if it's cognizable at all under Nevada law. It's a tort-based claim based upon an assumption of an obligation to oversee quality of care. And that would have related back to some point before presumably he had the endoscopy, right? Yeah. I mean, the negligence events would have occurred before 2000. What they were doing to make sure that the endoscopy center was complying with the best medical practices in the manner in which they sterilized their equipment and utilized or reutilized drugs that they shouldn't have been reutilizing. Essentially, yes, that's correct. It would be events occurring before the colonoscopy. But my point to your question would be I think there's a distinction here between the medical malpractice claim and other causes of action. We're not suing for medical malpractice. And the distinction I would make is discovery of Beach Street's responsibility, according to their own consultant, was not readily available. And that's in the testimony of Patty Allen. Why isn't it a malpractice claim? I mean, essentially, the heart of it lies in the failure to basically follow good antiseptic techniques, right? Well, it's not a malpractice claim because Beach Street is not a health care provider. Right. But your theory, your credentialing theory is that they had a, I guess we'd call it a fiduciary obligation, or a duty under tort law, a duty to the patients who were participants in the plan to see to it that the clinic was operated in a safe and clean condition, right? Yeah. But it goes back again to when Mr. Noggle would have discovered that cause of action against Beach Street. And I would again point out to the Sunrise case where until the plaintiff receives the actual facts that say that there's a malpractice case in that context, the statute doesn't begin. But wouldn't a reasonable lawyer, knowing in March of 2008 that her client had a potential malpractice claim against the clinic, commence an investigation in order to discover what, I don't know if the State Department of Public Health regularly inspects these places, I don't know if it's the State Medical Board, but wouldn't a reasonable plaintiff's lawyer want to know about the history of inspections at the clinic? Well, again, I would go back to the standard, which is discovery of the facts. But the point, and I think it's outlined in Ms. Morrison's affidavit, is there was a lot going on immediately following public notification. I guess it was what, the police had seized the records of the clinic and there was a criminal investigation ongoing with regard to how these folks were running their business? That's correct. And, I mean, the public entity responsible for the investigation didn't finalize their investigation until December of 2009. Mr. Noggle was the police officer, and it's his department that seized the records, right? Wasn't it a Metro investigation initially? It was a Metro investigation, but Mr. Noggle was not involved in that investigation. Wasn't your lawsuit filed against FISERV well before that public information was disclosed regarding the investigation? Parts of it, yeah. I mean, parts of the information had been disclosed on an ongoing basis. But in terms of the final report, you were correct. Ms. Morrison had already filed a complaint against FISERV. Is it your position that Beach Street's identity and relationship to the plan were the only facts not reasonably discoverable when Noggle discovered facts that led to naming FISERV as a defendant? I think that's fair. We did not have the testimony. I would point to three things within the record, Your Honor. So you knew you had a cause of action against whoever it was that was doing the quality assurance. You just had the wrong entity. I would agree. As of February of 2009, there were sufficient facts to say this was a quality assurance issue. February 2009, I mean, our complaint in 2010 is timely. So I would agree with that, and I'd point. Well, that takes me back to what information led Noggle to believe FISERV was responsible for the quality assurance and credentialing in 2009? What evidence led to that? I think if you review the affidavit of Billy Marie Morrison, she articulates the investigation uncovered beginning primarily after in the fall of 2008. Again, our point being that's after September 8, 2008. Well, that was available before September 8, 2008, wasn't it? That information in the context, I don't believe it was. I mean, again, just as Judge Tallman said, this was a novel theory, if you will, based upon in part Nevada statutes that were initially applied in the context of an HMO. So I think it took sufficient knowledge in order to apply that to the FISERV plan and also the context of what was occurring at the endoscopy center and that it was readily identifiable. I mean, that wasn't something that you would just know on March 2008. That took time to understand. But didn't he know in March of 2008 that these folks were under criminal investigation? All he knew was that the health care providers were engaging in improper conduct. Whether that was readily identifiable by a credentialing agency or an agency performing quality of care, he didn't have that knowledge, nor would he have. When did Metro seize all their records? Because there was a complaint in your brief that you couldn't get access to the records because they were held by the law enforcement agency. Well, the distinction, again, I would make is the cause of action versus the health care providers versus the district. It's just a simple date question. When were the records seized? They were seized sometime in the March 2008 timeframe. I couldn't tell you the exact date. We're not saying that there wasn't a serious investigation into the health care providers. What we're saying is what facts were available that would put somebody on, know that they have a cause of action against a credentialing or a quality assurance agency. That requires knowledge that the When did you find that information out about FISER? The plan administration, I would say after September 8, 2008. When you found that information that there's a potential cause of action against the quality assurance and the credentialing agency. That was after September 8, 2008, the fall of 2008. What information was it that you developed after that that led you to that knowledge? She developed through the information in Ms. Morris's affidavit. She explains that she developed the information through reviewing the insurance card, through reviewing the plan documents, reviewing the course of events that happened at the endoscopy center. And that was all available in March 2008? It was not. And it wasn't in the contract. It wasn't available or she didn't ask? I mean, isn't that the distinction? Well, the distinction is the fact giving rise to the cause of action, that you would have knowledge that this credentialing entity or any credentialing entity would be responsible for the injury. And that doesn't occur until after there's information developed through the investigation itself, long after September 2008. But, again, that report was released almost a year after you filed suit against FISER? The final report was. Yeah. Okay. And with that, I'll reserve my 35 seconds. Okay. Thank you. Your Honors, may it please the Court. I'm Craig Cesar. I represent Beach Street Corporation. Your Honor, we believe, Your Honors, we believe that Judge Dawson got it right, that he looked at the applicable law. That's no surprise. He looked. I have seldom seen anybody come up second in these arguments and say, you know, we agree that District Judge goofed. So you're not exactly unusual in that regard. That's true, Your Honor. But in any event, the points that Judge Tallman in particular made are the points that we think, from a factual standpoint, demonstrate without question that the — Why don't you run them by me, because I wasn't persuaded. Okay. Here's where we are. I saw what's left cold. All right. Well, I'll try and warm you up then. What is the thing, the first thing, earliest thing in the record that pointed to Beach Street as the entity that's in charge of quality of care? The fact that we have a card, an insurance card, which says Beach Street. Let's look at the insurance card. It's on 35. It's exhibit record ER-128. It mentions Beach Street's name on the back of the card. And what does it say about it? It says Beach Street. Let me just get to it, because I have it here. And it's a little fuzzy, but I've got it. It's a fuzzy card. It's a fuzzy card. It's at the upper left-hand corner. Beach Street is mentioned as the network. So that was in Mr. Nagel's possession. Okay. And where does it say in charge of quality of care? The next step is when he presents that card to — I'm sorry. I'm sorry. Is it in this card? It is not mentioned in this card. So all we have from this card is the fact that it says Beach Street on it. Right. But we have the fact that Beach Street is a network that can be accessed by Mr. Nagel as a covered patient to go to a network provider, which in this case was the endoscopy center. And what happened is he took this card and he went to the endoscopy center in 2006. You remember my question. Yes. I'm getting to the next step, but I'm trying to go through the process by which Mr. Nagel would be aware. We're looking for a date. The date I asked you. The next date — What is the earliest point in time that he had something that says — It's 2006. It's the letter that approved his procedure. Okay. I've got it. I've got it. Okay. What I was trying to suggest, Your Honor, is that letter is generated — Just tell me what it is in it that says that. The letter is exactly what Judge Dawson mentioned, which is there's a statement in the letter that says — It doesn't make it any stronger if Judge Dawson mentioned it. So just tell me what in the letter says Beach Street is responsible for quality care. Beach Street Utilization Management Program is designed to ensure the availability of high-quality health care at affordable cost. That's the language that is in the letter that was sent pre-approving the procedure that took place. That's it? That is one point, yes. That's the point that is in November 6th of 2006. Where does it say Beach Street is responsible for quality of care? Well, but, Your Honor, it does not say precisely what you're asking, which is — So let me make it perfectly clear. Is there anything in the record before they actually got the notice from the people they sued that says that precisely? Is there anything? Yes. I would say if you also look at — Show me the thing that says it precisely. Okay. I would ask you to look again at the summary plan description, which is a document which Mr. Nagel receives as a participant in the plan. Hold on a second. Let me get to it. Summary plan description, yes. Okay. I think you would look at page 90 is the mention of — I have something that says page 52 and also page 10 and also page 94, depending on where on the page you look. Okay. 52 is a mention of Beach Street. Is that what you're referring to? That's one. 90 says the same thing. That's why I pointed you to 90, but 52 is also — Where here does it say Beach Street is responsible for quality care? Health care management company. I'm sorry? Health care management, prior authorization. It does not use the words — Let's do this simple. I ask a question, and you answer my question. Where on this page does it say Beach Street is responsible for quality care? It does not use those specific words. No, the answer is nowhere. It does not use those specific words. Okay. So what words does it use that would, to a reasonable mind, suggest that? Anyone who's — Just tell me the words. Health care management company, preferred provider organization. Wow. That certainly tells it to me. Well, Your Honor, if you take the background of what those terms mean, any lawyer who is involved in this particular industry or in this particular area or does basic research as to what a preferred provider organization does — So this is something that notice is to the lawyer, not to the — It's to the lawyer and to the individual, because the lawyer is obviously investigating the claim on behalf of the individual. The facts that are required under the legal standard, which is notice inquiry in this particular case, Mr. Noggle was on notice, and his lawyer certainly was on notice representing him. Okay. So what, again, are these words on this page? Health care management company, preferred provider organization, prior authorization. I don't actually see it here on page 52. It's at the very top of where it says Beach Street. In the little box there? The parentheses. Yes, in the box. Oh, the parentheses. This is the thing in parentheses. Yes. Beach Street, health care management company, preferred provider organization, and prior authorizations. Yes. In this particular document, that's the language we would point to. And that, to use screams, responsible for quality care. I understand. Now, I want to make it perfectly clear. I just want to know what your position is. That's my position, yes. Because I understand what those terms mean, and a lawyer who has any basic understanding of the health care industry and what a PPO does understands that that is an entity that has some involvement. I would not go as far to say a credentialing responsibility of duty because I definitely agree with what Judge Tallman said, that this is a novel cause of action, negligent credentialing, particularly in this context with a PPO as opposed to something like a hospital or a health maintenance organization, which has a much higher standard of responsibility and duty, if a duty at all. But that's a legal argument that was separate and apart from the issues that are presently before the court. Right. And you decided to throw it in just to confuse things? No. We are only pursuing the question, notice that these are the people responsible for quality of care. Now, what flows from that, what cause of action arises is interesting, but of no consequence here. I agree with you on that. So you say somebody looking at this would say, I just want to make sure I got your position. You read the stuff in parenthesis and then say, aha, these people are responsible for the quality of care. I am on notice that this is Yes or no. Yes or no. Yes. I am on notice that there is an entity that has an involvement with respect to my receipt of care from a facility that is part of its network. And I know that because I've gotten the summary plan document. I've gotten my call. Lots of people are involved. The question is, are they involved with quality of care? So I would like you to say it out loud. Does this tell you that these people are involved with assuring quality of care? It does. It puts me on notice that I should investigate that. And that's the legal standard. Mr. Caesar, are you saying that anybody who knows this area of law knows that what that means is that it's Beach Street who chooses the endoscopy centers that are designated as preferred providers? Anyone who is familiar with this area of law understands that a preferred provider organization enters into contracts with providers and with payors to create a structure by which a patient who is covered by the payor's plan can go receive a treatment at that network provider at a discounted rate because that's part of the contract that's provided. And that provider can then expect from the payor prompt payment of the fees, whatever the discounted rate that have actually been charged for the service.  And part of that process is Beach Street not necessarily going through the details of credentialing that a hospital might, but they do have an investigative process by which they look at whether or not someone is licensed in the state. They rely on the state entities that were mentioned in the prior discussion with Mr. Sharp. They go and look at the records that indicate is this provider licensed in the state. They will go to the database that are maintained for physicians to see if there's violations by this particular entity. In this case, there were not. But they go and that's another source that's available. People in the industry and lawyers who are attempting to prosecute claims with respect to this would certainly know that from this. So under Nevada law, when we determine the question of inquinotus, do we look at the lawyer? Do we look at the client? I think we look at the totality of both of what they know, because certainly you can't. I wasn't asking for your personal opinion. I was asking under Nevada law. You want to say that lawyers should have known. And, you know, that sounds plausible to me, maybe. But generally my understanding was that for purposes of statute of limitations, you look at what a reasonable consumer, a reasonable plaintiff would think. I understand. Not a reasonable plaintiff represented by a specialized lawyer. So is the law in Nevada? I'm sorry, Nevada law, right? This is Nevada law, yes, Your Honor. Okay. I got a lot of cases. Nevada law. Under Nevada law, is it a test that you look at the lawyer representing the plaintiff, or do you look at the reasonable plaintiff? Frankly, it says that the plaintiff is aware of the facts. So you could argue from the language, because the language of the cases is not that clear, that it says specifically lawyer more. Let me turn it around a little bit. You were aiming at the lawyer. Is there a case from Nevada that you can cite that relies on the knowledge of what a knowledgeable lawyer would know, rather than a knowledge of a reasonable plaintiff? I would suggest to Your Honor that the cases that are relevant, which have been cited by both parties in the brief, do not make that clear of a distinction. So there's not something that says that's a lawyer only? That's a no. I would say there's not a case that specifically says you rely on the lawyer alone. What's wrong with no? I would say no. There we go. We could have a lot of time that way, you know. So there is no case. We'd have to make it up. Is there a case from another jurisdiction that says that you look at the lawyer rather than the plaintiff? Well, but, Your Honor, I think you're right. Did you hear the question? I heard the question. Yes. No. I don't know. I would say the best answer for me at this point is I'm not certain that there is such a case, so I don't know that from another jurisdiction. But here's what I would say. Do you suspect there is such a case? I suspect there may be cases, but I can't point you to one from another jurisdiction. Have you ever seen one? I'm not certain that I can recite one out of memory. Is this respect or wishful thinking? It's respect. So the Hail Mary. It's respect based on 37 years of practice of law. I've never seen such a case, but. I appreciate it, Your Honor, but I suspect such a case exists. But regardless. I've actually passed the bar longer ago than you have. I bet you have, Your Honor. So there we go. I have never seen such a case. Your Honor, I would say that if you look at the facts. But it's important because the question of whether or not you look at the plaintiff of what a reasonable person in plaintiff's position would consider to stand and whether you look at what a reasonable lawyer representing him in this case, I mean, those are very different standards. Well, Your Honor. I mean, I don't think any plaintiff, much less any reasonable plaintiff, would understand that parenthetical to mean what you say it means. I'm perfectly willing to believe that a lawyer would because lawyers can believe anything. I guess, Your Honor, I guess I can disagree with you because I think that. You know, when it comes to construing language. I understand that you're the questions you're trying to elicit a response from me is to indicate that Mr. Noggle as a policeman would not be aware simply because of the information he had available. The card. Even if you're a Federal judge, he wouldn't get it. Your Honor, I wouldn't necessarily concede that. I wouldn't necessarily concede that point. I think the relevant point here, again, is there were facts available to him by March of 2008. They were in his possession that he had facts that put him under an obligation to do additional investigation. And that's the standard. Why is that a jury issue? I mean, he may have had facts and main facts wind up being that he should have said, but I'm my understanding is that statute of limitations is a jury issue unless it's undisputed. It's it. I understand that it's the. So why? Why isn't this? Why isn't this a jury issue? Because we think the facts are uncontroverted here. There are sufficient. There are sufficient facts. But even giving the deference to the plaintiff, which is his due as a nonmovement under summary judgment, we think there are sufficient facts to support summary judgment, because the facts are he had a procedure done in 2006 in which he had a card in which he received preauthorization with a notice from Beach Street. He got an explanation of benefits, which is also in the record, which had Beach Street as the network pursuant to which your services are being provided and paid at a discount. So he had as a member, a participant of a plan, he had available to him the information which is given to every plan member at the beginning of every year that Beach Street was the PPO that was the network that created providers to whom he could go. And he went to one of those providers based on the Beach Street card, based on the Beach Street plan. And he was ultimately received that treatment, and he got a notice that said that it was discounted based on Beach Street. All of those factors together would put him on notice that Beach Street is a party that's involved in this. And he did not take the steps that are the obligation that he has under the law of disinquiry, which is the standard that applies here, he did not take the steps that he should have in order to inform himself. And because of that, with, unfortunately, the additional involvement of his attorney who apparently was distracted by health issues and things like that, he didn't get a complaint filed against Beach Street in time. And for that reason, the judgment of the district court should be affirmed. Thank you, Your Honor. My time has long run out. Okay. Your Honor, I would point out two quick points. It is a question of fact. And I think if you look, as an example, to the definition of health care management company, and that's in the plan documents at 118 and 119, and it talks solely about prior authorization, not quality of care. Nobody is suing Beach Street saying that the colonoscopy wasn't medically necessary. Under your theory of credentialing, why wouldn't it be reasonable for Ms. Morrison, knowing that Beach Street was the organizer of the network, to look further into Beach Street's role in referring Mr. Noggle to this particular endoscopy center, which was a provider within the plan? I'd have three points. The first, it's not the standard of Ms. Morrison. And if you refer back again to the Wynn case — You're saying that the lawyer has no role whatsoever in a statute of limitations? I think the lawyer goes to the reasonableness of whether or not they should have discovered. But if you go back to the Wynn case — Well, that's what we're talking about, aren't we? Whether or not she should have reasonably discovered had she conducted a diligent investigation. It's knowledge of the facts. And if you go back to the Wynn case, it wasn't the fact that the attorney was hired or the attorney could have done something else. It was receipt of the surgical report. That formed the basis of the malpractice claim. That's what triggered. And that was after the lawyer had been hired. So it's not — the focus has to be on when the facts are made available, not — that's the key issue under Nevada law. So that would be my first point. My second point goes to the question of whether or not that issue is a question of fact. And I would point the Court to the testimony of Patty Allen, who is the consultant for Beach Street and the plan, very sophisticated. She was asked — the question was, as far as you can recall, the plan members weren't told that Beach Street had agreed with the Metro plan to properly credential all participants. Her answer was no. So that is — this wasn't something readily available to Mr. Noggle or Ms. Morrison. The fact forming the cause of action wasn't available until FISERV was sued and the information with FISERV was provided. And there was no allegation that the complaint with FISERV should have been, you know, filed before September 8, 2008. That complaint was filed timely. And so our submission would be whether or not Beach Street was sued timely is a question of fact. It's not incontroverted. I'm still not clear. What was the aha moment when you determined — when Noggle determined there was a cause of action against FISERV? Well, the aha moment was after — in the fall of 2008, based upon the investigation that had been conducted and information had been provided about — about information regarding the credentialing file. And that's in Ms. Morrison's affidavit. But it was after September 8, 2008. But that was — she discovered somebody else had discovered it, right? In part. And again, I mean, I think if you go back to the fact forming the cause of action, which is the standard under Nevada law, the fact forming the cause of action was not available until at the earliest the affidavit of Denise Best was received, which was in 2000. I believe that was in August of 2010. We didn't receive the actual contract saying we're going to oversee quality of care at the plan until long after that. And that was in the course of discovery. Right. So what's the piece of evidence that constitutes the aha? The aha as to Beach Street? Yes. That would be — I would point to three things. The — well, three primary things that I would point to. And that's the unsigned contract that Beach Street agreed to do the credentialing, the provider manual that's a Beach Street internal record not available to the public that said oversight of its providers, and the contract between Beach Street and the endoscopy center, which also is not readily available, saying that there were quality of care functions. And I can give you — would you like me to give you the cites to those records, Your Honor? I have those available. Just take me a few minutes or a few moments. So the provider manual, if you were to look at 396 and I believe 397, talks about quality of care. The contract with — between Beach Street and the plan, which for whatever reason was not signed, it's 285 through 337. Eighty-five through 337. That's correct. And the portion that said they would do credentialing was at 302. And then — The provider agreement in my notes, it's 356 through 361. And the testimony of Patty Allen, which is also heavily refined, is at 266 through 67. I have one last question. Yes. What information did you have about FISERV that you didn't have about NOGIL when FISERV got sued for the quality assurance and credentialing? I'm sorry. I'm not sure I understand your question. You sued FISERV and not NOGIL. What information did you have about FISERV that you didn't have about NOGIL? You mean Beach Street? I'm sorry. Beach Street. I'm sorry. What information did you have about FIGL that you didn't have about Beach Street that caused you to sue FIGL and not Beach Street? Well, the basis for suing Beach Street relies, if you look at the plan documents — My question is, why did you sue FISERV? That's based on, again, the documents in the plan identified them as plan administrator, coupled with the facts it uncovered through the course of the remaining, you know, throughout the fall of 2008 showing that this is something readily identifiable. What was identifiable? The conduct by the providers was readily identified by a quality of care organization. Because, again, it's two steps. It's obligation and breach in order to have the legal injury that's referred to in the WIND case. You need knowledge of both. So there's two parts to this case. Okay. My question is, what did you know about FISERV that you didn't know about Beach Street when you sued FISERV? What we knew about FISERV is that they had said they were responsible for the administration of the plan. And on that basis you sued them? That basis — well, that basis coupled with the fact that the cause of action, that the conduct at the endoscopy center was readily identifiable by a quality of care organization. And that — those facts weren't learned until long after September 2008. But I don't think you've answered Judge Reyes's question. And now I have the same one. Why did you sue FISERV if you didn't find out all this other information until after you sued FISERV? It was an ongoing process. Obviously we had enough information in 2009 — or Ms. Morrison had information in 2009 to justify it. My point is that information, it's a question of fact whether that was reasonably available before September 8, 2008. What information are we talking — that's what's confusing me. Because what I heard you say was that you conducted discovery in the fall of 2008, which presumably revealed the documents that you gave me the citations to three minutes ago. As to Beach Street? Yes. The documents I cited to you there, we didn't get until discovery against Beach Street. Okay. Maybe I'm just dense here this morning, but what caused you to sue FISERV, which I think everybody acknowledges was timely, on the credentialing issue? What information did you have? That was the development of the information showing that the endoscopy center's conduct was systemic and readily identifiable by a quality of care type organization. And what evidence are we talking about? Evidence of systemic behavior like doing — primarily doing colonoscopies too quickly, having too many patients such that colonoscopies couldn't be — Did that come from other lawyers who had other claims against the endoscopy center? Did it come from some report? It came from facts developed during the course of the public investigation, which was ongoing from — But the investigation was ongoing. There was a lot of discovery. I'm sorry if I'm not being clear, but — Well, I don't understand what evidence that you had that caused you to sue FISERV when you knew that Beach Street was also involved in picking providers. Well, in response to that question, we didn't sue Beach Street because we had no idea that they were responsible for the quality of care. I mean, that we didn't know. But what made you think that FISERV was and Beach Street was not? The combination of the plan administrator plus knowledge of the behavior at the endoscopy center. And the behavior at the endoscopy center was received on an ongoing basis, primarily most of which was occurring after September 2008. But didn't you know that it was Beach Street that chose the endoscopy center as a preferred provider long before that? But going back again, if you look at the plan documents as to what they define health care management and a preferred provider to be, it's only they give you a discount. There's nothing within that to a reasonable person that says they're performing quality of care functions for the benefit of Mr. Nagel. Did anyone try to find out who was responsible for quality assurance credentialing before FISERV was sued? I don't know the answer to that because I didn't represent Mr. Nagel. I mean, I can only tell you what's in the affidavit of Billy Murray Morris. And I don't know if that specific question was addressed. Do you have a view on the question I explored with supposing counsel as to whose knowledge we probe in determining whether somebody was a notice?  Well, I mean, if you go back to the development of the discovery rule case law, I think that dates back to like 1980 in Nevada. But you have the Sorensen case, you have the Bemis case, you know, 20, 30 plus years of jurors. The rule is no reason we should have known, right? Of the facts. And that's why I keep pointing back. If the client at some point gets represented by a lawyer, his ability to know facts or understand facts sort of expands because he now has a lawyer. Well, again, it's knowledge of the facts. And that's why I keep going back to the Sunrise case because I think that's apropos. I mean, the plaintiff had retained the attorney, and the Supreme Court didn't say it's at the point the attorney knew or should have known. It was at the point when knew, and that point was when they received the surgical report, which formed the basis for the claim for malpractice. The information in this case that forms the negligence claim against Beach Street wasn't readily available until the earliest on the record. But isn't it a combination of both, the knowledge of the client and the client's lawyer? Because otherwise a lawyer could never be liable for malpractice for missing a statute of limitation. Well, I don't — I mean, I guess I see your point. But again, going back to the issue, which I think is focused in on when, it's knowledge of the facts giving rise to the cause of action. That knowledge did not occur until 2010. But in response to that long colloquy that Judge Kaczynski had with Mr. Caesar, we were focusing solely on what the client knew. But isn't it more than that in trying to determine whether or not sufficient information was known or could reasonably have been known on diligent inquiry? And doesn't the lawyer have some responsibility once she undertakes the representation of the client? Well, I mean, of course the attorney has responsibilities, but — But what about the knowledge that the lawyer has that the client may not personally have? Well, I guess my point would be regardless, if you go back to the Winn case where Winn had a lawyer and the court didn't say it's at the point the lawyer gets involved, it was when the record was given which gave knowledge of the malpractice claim. And whether or not that record was actually reviewed, that didn't matter. That gave the constructive knowledge. Our point would be — Constructive knowledge to whom? The lawyer or the client? Well, it would be to the client. Through the client's lawyer? In that particular — Aren't we back to asking whether or not the lawyer conducted a diligent investigation on facts that should reasonably have triggered further inquiry? Well, regardless, the facts forming the cause of action weren't readily available to Ms. Noggle or Ms. Morrison. And I go back again, I don't — I mean, I go back again to the real crux of it, which is until we receive that unsigned contract and the provider manual that said Beach Street is going to do certain things for quality of care, I mean, that's the facts forming the basis for the cause of action. And those things weren't discoverable until well after September 8, 2008, regardless of the standard you use. But you did file a — I mean, the complaint in September 2008. That is correct. And that was based upon the information provided by FISERV's attorney in the form of the affidavit of Denise Best that said FISERV did not contract to provide that information. That was Beach Street. So the question way back, what was the AHA document, wasn't that the AHA document? I mean, that — you're right. I mean, that is really the AHA moment of — and again, that wasn't received until 2010 or long after September 8, 2008. What investigation was done to find out who was responsible for quality assurance? Did anyone make a phone call or write a letter or anything? Well, a review of the plan documents. That was it? Well, a review of the — the same thing that the court trial judge relied upon, and our point would be that those documents provide two inferences. And again, I would go back to Patty Allen's testimony herself, and this is Beach Street's consultant, it's the plan's consultant. She said the plan members didn't know that Beach Street had assumed this responsibility. It wasn't something readily available to Ms. Morrison or to Mr. Nagle. Okay. Thank you.
judges: Rayes, Kozinski, Tallman